UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **G.R. By and Through His Guardians Ad Litem DARCY MIRAMONTES and CHRISTOPHER ROBERTS,**<br><br>Plaintiff,<br><br>v.<br><br>Del Mar Union School District,<br><br>Defendant. | Case No.: 3:19-cv-00132-AJB-MSB<br><br>**ORDER:**<br><br>**(1) DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 29);**<br><br>**(2) GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (Doc. No. 40); AND**<br><br>**(3) DENYING AS MOOT PLAINTIFF'S MOTION TO SUPPLEMENT THE ADMINISTRATIVE RECORD (Doc. No. 18)** |

Presently before the Court is an appeal from the California Office of Administrative Hearings ("OAH") under the Individuals with Disabilities Education Act, 20 U.S.C. § 1400 et seq. ("IDEA"). Plaintiff G.R. and Defendant Del Mar Union School District ("the District") filed cross-motions for summary judgment. (Doc. Nos. 29, 40.) G.R. also moves to supplement the administrative record. (Doc. No. 18.) All motions are fully briefed. For the reasons set forth below, the Court **DENIES** G.R.'s motion for summary judgment,

**GRANTS** the District's motion for summary judgment, and **DENIES AS MOOT** G.R.'s motion to supplement the administrative record.

## I. BACKGROUND

Plaintiff G.R. is a 12-year-old boy diagnosed with extreme anxiety and autism. The central issue in this case is whether the District denied a free, appropriate public education ("FAPE") by failing to make substantive changes to G.R.'s Individualized Education Plan ("IEP"). (Doc. No. 29-1 at 6.) If the answer to that question is "yes" the next issue is whether the District should reimburse the parents of G.R. ("the Parents") for the parent's unilateral placement of G.R. in a residential treatment center ("RTC").

In the beginning of his third-grade year, G.R. was placed in a general education classroom within the District with various special education supports. (Complaint ("Compl.") ¶ 8.) By October 2015, G.R. exhibited significant behavioral issues at school such as destruction of property, aggression towards peers and staff, and eloping from his classroom. (*Id.*) At an IEP meeting on October 21, 2015, the District and G.R.'s parents ("the Parents") agreed that the current classroom environment did not provide enough support for G.R. (*Id.*) G.R. then transitioned to a Social Emotional Academic Support ("SEAS") classroom in a neighboring school district. (*Id.*) But G.R.'s behavior only escalated, and it was determined that the SEAS classroom did not have sufficient supports for G.R. (*Id.* ¶ 9.)

In February 2016, G.R. then began attending North County Academy ("NCA"), a therapeutic and behavioral public school in San Diego County. (*Id.* ¶ 10.) During the fall semester of 2016, G.R. only had one behavior incident that required physical restraint. (*Id.* ¶ 13.) However, starting in the spring semester of 2017, G.R.'s behaviors escalated, and his academic progress regressed. (*Id.* ¶ 14.) From February 16, 2017 through June 12, 2017, NCA staff physically restrained G.R. in behavior holds at least 45 times. (*Id.*) The Parents were not informed of all of the behavioral incidents through behavioral emergency reports ("BER"), which are required if a school district uses physical intervention. (*Id.*) During this time with G.R. at NCA, the Parents became concerned with G.R.'s behavior at school

and also at home. (*Id.* ¶ 15.)

### A. June 9, 2017 IEP Meeting

On April 30, 2017, the Parents asked the District to assess G.R. for potential placement in another facility, and on May 10, 2017, the District denied the Parents' request. (*Id.*) In response, the Parents subsequently obtained an expert psychologist report regarding G.R.'s educational program. (*Id.*) The expert opinion was that continued placement at NCA was not appropriate for G.R., and he should instead be placed in an RTC. (*Id.* ¶ 16.) An IEP meeting was held on June 9, 2017, and the Parents presented the expert's report and recommendation that G.R. be placed in an RTC. (Doc. No. 29-1 at 9.) The District ultimately determined that placement in an RTC was unnecessary and did not change G.R.'s education program. (Compl. ¶ 17.) Because the Parents felt they did not have another option, the Parents privately placed G.R. in an RTC program on June 14, 2017. (*Id.*) G.R. asserts that the District's refusal to place G.R. in an RTC and failure to change G.R.'s IEP evidenced a denial of FAPE. (*Id.*)

### B. Subsequent RTC Placements and the May 15, 2018 IEP Meeting

For help in determining the appropriate RTC to privately place G.R. in, the Parents obtained an educational consultant, who recommended the Parents place G.R. at Cherry Gulch, an RTC located out of state in Emmett, Idaho. (*Id.*) G.R.'s behavior did not improve at Cherry Gulch, and Cherry Gulch ultimately terminated his placement. (*Id.* ¶ 18.) G.R. was then privately placed and graduated from SUWS of the Carolinas, an intensive short-term behavioral program located in Old Fort, North Carolina. (*Id.* ¶ 19.) On January 3, 2018, after G.R.'s graduation from SUWS of the Carolinas, G.R. was privately placed at Sandhill Child Development Center, an RTC in Los Lunas, New Mexico. (*Id.* ¶ 20.)

Another IEP meeting was convened on May 15, 2018. G.R. alleges that against the opinions of the staff that worked with G.R. at the RTCs, and based on an assessment conducted by a school psychologist without any experience assessing students at RTCs, the District offered to place G.R. back at NCA on May 15, 2018. (*Id.* ¶ 21.) In response, Parents again obtained a private assessment, at their own expense, in August 2018. (*Id.*

¶ 22.) The private assessment concluded G.R. required continued placement at an RTC. (*Id.*) G.R. argues the District's offer of place at NCA instead of an RTC or a change of G.R.'s IEP was a denial of FAPE at this May 15, 2018 meeting. (*Id.*)

## II. PROCEDURAL HISTORY

On January 30, 2018, Plaintiff filed a request for due process ("Due Process Hearing") with the Office of Administrative Hearings ("OAH"). (*Id.* ¶ 24.) The Due Process Hearing was held in San Diego before Administrative Law Judge ("ALJ") Darrell Lepkowsky on August 28-30, 2018, September 4-6, 2018, and September 12-14, 2019. (*Id.* ¶ 30.) At bottom, G.R. claimed several procedural and substantive due process violations against the District, primarily asserting that the District's failure to offer him placement at an RTC denied him a FAPE. (Administrative Record ("A.R."), Doc. No. 13-7 at 1.) The ALJ concluded in her decision:

> Student failed to demonstrate that he required placement at a residential treatment center at any time relevant to this case to receive a FAPE. Student failed to prove that Del Mar's assessments did not meet legal standards. Student further failed to prove that Del Mar did not timely assess him in the areas of academics, psychoeducational, or cognition. Student also failed to show that his October 21, 2016 IEP did not offer him a FAPE. Finally, Student failed to prove that Del Mar's delay in providing Parents notice of five behavioral emergencies denied him a FAPE.
>
> However, Student proved that Del Mar should have assessed him in spring 2017, to determine the reason for his increasing behavioral issues. Student also proved that Del Mar denied him a FAPE by failing to provide appropriate services and supports to address his behavioral needs in the June 9, 2017 IEP. Del Mar met its burden of proving that the May 8, 2018 IEP, as modified on May 15, 2018, constituted a FAPE in the least restrictive environment.

(A.R., Doc. No. 13-7 at 1.)

In sum, the ALJ determined G.R. prevailed on two aspects of the case: (1) the failure to conduct a behavior assessment in the spring of 2017; and (2) the failure to add additionally services to G.R.'s IEP at the June 9, 2017 IEP meeting to address the

deterioration in his behavior. (A.R. at 2942–43.) The ALJ awarded G.R. reimbursement for the private assessment Parents obtained in the spring of 2017, and 80 hours of compensatory education services, based on recommendations made by G.R.'s expert witness. (*Id.*) G.R. partially appeals the ALJ's decision. The main issues on appeal are whether the IEP offers of June 9, 2017 and May 15, 2018, which did not include placement at an RTC, denied G.R. a FAPE by failing to provide the appropriate placement, services, supports, and accommodations to G.R. (Doc. No. 29-1 at 7.) As such, G.R. asks the Court to reverse the ALJ's decision, and requests the "Court order the District to reimburse Parents for the private placements they funded in light of the District's denial of FAPE, as opposed to the compensatory education services awarded by the ALJ." (Doc. No. 41 at 10.)

On August 7, 2019, G.R. filed a motion for summary judgment. (Doc. No. 29.) On September 18, 2019, the District filed a cross-motion for summary judgment, and opposed G.R.'s motion for summary judgment. (Doc. No. 40.) Both motions were fully brief. This order follows.

## III. LEGAL STANDARD

### A. Standard of Review

Although the parties present the appeal as cross-motions of summary judgment, "the procedure is in substance an appeal from an administrative determination, not a summary judgment." *Capistrano Unif. Sch. Dist. v. Wartenberg*, 59 F.3d 884, 892 (9th Cir. 1995). The Ninth Circuit has also recognized that the procedure under the IDEA is "not a true summary judgment procedure," but is "essentially . . . a bench trial based on a stipulated record." *See Ojai Unified Sch. Dist. v. Jackson*, 4 F.3d 1467, 1472 (9th Cir. 1993) (internal citations omitted).

This Court has jurisdiction of the matter pursuant to 20 U.S.C. § 1415(i)(3)(A). In such an action, "the court . . . (i) shall receive the records of the administrative proceedings; (ii) shall hear additional evidence at the request of a party; and (iii) basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." *Id.* § 1415(i)(2)(C).

"Based on this standard, complete de novo review of the administrative proceeding is inappropriate." *J.W. v. Fresno Unif. Sch. Dist.*, 626 F.3d 431, 438 (9th Cir. 2010) (internal quotation marks and citations omitted). Instead, the district court reviews the administrative decision under a modified de novo standard. *See Ojai Unified Sch. Dist.*, 4 F.3d at 1471–73. "[T]he provision that a reviewing court base its decision on the 'preponderance of the evidence' is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Central Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982). The reviewing court must give "due weight" to the administrative proceedings. *Id.*; *Wartenberg*, 59 F.3d at 891–92. However, how much deference is afforded to the administrative decision is for the discretion of the court. *Gregory K. v. Longview Sch. Dist.*, 811 F.2d 1307, 1311 (9th Cir. 1987). Deference is particularly warranted when the hearing officer's findings are "thorough and careful." *See Union Sch. Dist. v. Smith*, 15 F.3d 1519, 1524 (9th Cir. 1994).

### B. The Individuals with Disabilities Education Act

The Individuals with Disabilities Education Act ("IDEA") provides that children with disabilities are entitled to a FAPE. *See* 20 U.S.C. § 1400(d); *see also* Cal. Educ. Code § 56000. A FAPE is defined as special education and related services that (1) are available to the child at no cost to the parent, (2) meet the state educational standards, and (3) conform to the child's IEP. *See* 20 U.S.C. § 1401(8). Federal and California state law require a district to provide a FAPE in the least restrictive environment ("LRE") for each special education student. *See* 20 U.S.C. § 1412(a); 34 C.F.R. § 300.114; Cal. Educ. Code § 56031, 56033.5.

The IDEA, its regulations, and state law provide that a state "agency shall conduct a full and individual initial evaluation . . . before the initial provision of special education and related services to a child with a disability. . . ." 20 U.S.C. § 1414(a)(1)(A); *see also* Cal. Educ. Code § 56320. "The initial evaluation . . . must consist of procedures (i) To determine if the child is a child with a disability. . . .; and (ii) To determine the educational

needs of the child." 34 C.F.R. § 300.301(c)(2).

Further, the evaluation must be "administered by trained and knowledgeable personnel" and "in accordance with any instructions provided by the producer of the assessments." 34 C.F.R. § 300.304(c)(1)(iv), (v); *see also* Cal. Educ. Code §§ 56320(b)(3), (g) and 56322. The child must also be "assessed in all areas related to the suspected disability, including, if appropriate, health, vision, hearing, social and emotional status, general intelligence, academic performance, communicative status, and motor abilities[.]" 34 C.F.R. § 300.304(c)(4); *see also* Cal. Educ. Code § 56320(f).

In analyzing whether a FAPE was available to a student under the IDEA, its regulations and state law, the court must conduct a two-pronged analysis. *See Rowley*, 458 U.S. at 206–07. The first prong is the "procedural prong" and assesses whether the state complied with the procedures set forth in the IDEA. *Id.*; *Amanda J. v. Clark County Sch. Dist.*, 267 F.3d 877, 890 (9th Cir. 2001). The second prong is the "substantive prong" and determines whether "the individualized education program developed through the Act's procedures [was] reasonably calculated to enable the child to receive educational benefits." *Amanda J.*, 267 F.3d at 890 (quoting *Rowley*, 458 U.S. at 206–07). Here, the first prong is not at issue, and so, the Court focuses on the second prong.

## IV. DISCUSSION

### A. Deference Accorded to the ALJ

As an initial matter, G.R. argues the Court should accord the ALJ little deference because the ALJ ignored evidence that favored G.R. and the ALJ's findings did not accurately reflect the evidence. (Doc. No. 29-1 at 12–13.)

The level of deference the Court should provide the ALJ's decision "is a matter of discretion of the courts." *Gregory*, 811 F.2d at 1311. District courts should give more deference to a state administrative agency where the ALJ's decision is "thorough and careful," *Smith*, 15 F.3d at 1524, and when it evinces "careful, impartial consideration of all the evidence and demonstrates his [or her] sensitivity to the complexity of the issues presented." *Fresno Unified Sch. Dist.*, 626 F.3d at 438 (quoting *County of San Diego v.*

7

*California Special Educ. Hrg. Off.*, 93 F.3d 1458, 1466 (9th Cir. 1996)). An administrative decision is "thorough and careful" when "the officer participates in the questioning of witnesses and writes a decision 'contain[ing] a complete factual background as well as a discrete analysis supporting the ultimate conclusions.'" *Park v. Anaheim Union High Sch. Dist.*, 464 F.3d 1025, 1031 (9th Cir. 2006)).

Here, the ALJ personally participated in the questioning of witnesses during a hearing that lasted nine days. The ALJ also wrote an incredibly thorough 66-page, single-spaced opinion that included relevant details from the factual record. (A.R. at 2879–2944.) The ALJ's decision also reviewed the legal standards governing claims under the IDEA, analyzed the issues and arguments presented, and supported her conclusions with specific factual findings. Therefore, the ALJ's decision warrants particular deference. As to G.R.'s claim that the ALJ ignored evidence that favored G.R. and that the ALJ's findings did not accurately reflect the evidence, it is not the role of this Court to discount the ALJ's findings of fact simply because G.R. "can point to singular instances where [he] believes that the evidence supports a conclusion in the opposite direction." *Sacramento City Unified Sch. Dist. v. R.H.*, No. 2:14-CV-01549-TLN-DB, 2016 WL 5870774, at *17 (E.D. Cal. Oct. 7, 2016).

### B. June 9, 2017 IEP

The Court will first address whether the June 9, 2017 IEP constituted a denial of FAPE. The ALJ determined the District denied G.R. a FAPE in the June 9, 2017 IEP by failing to add necessary services to change G.R.'s education program. (A.R. at 2936.) However, G.R. challenges the remainder of the ALJ's decision as to the June 9, 2017 IEP. First, G.R. asserts the ALJ erred in her finding that G.R. did not require placement at an RTC as of the June 9, 2017 IEP meeting. (Doc. No. 29-1 at 15.) And second, G.R. argues the ALJ erred in awarding compensatory education services instead of reimbursement because "Parents did not request compensatory education and the law supports a remedy of reimbursement when Parents unilaterally place." (*Id.*)

A student requires placement in an RTC if such placement is "necessary to provide

the student with special education and related services." 34 C.F.R. 300.104. The requirement that the residential placement be necessary furthers the IDEA's purposes of assuring that "children with disabilities, including children in . . . private institutions . . ., are educated with children who are not disabled," and that "separate schooling . . . occurs only when the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." 20 U.S.C. § 1412(a)(5)(A). The Ninth Circuit has identified three possible tests for determining when to impose responsibility for residential placements on the special education system: "(1) where the placement is 'supportive' of the pupil's education; (2) where medical, social or emotional problems that require residential placement are intertwined with educational problems; and (3) when the placement is primarily to aid the student to benefit from special education." *Cty. of San Diego v. California Special Educ. Hearing Office*, 93 F.3d 1458, 1468 (9th Cir. 1996). Additionally, in *Clovis Unified School District v. California Office of Administrative Hearings*, 903 F.2d 635 (9th Cir. 1990), the Ninth Circuit ruled that reimbursement under the IDEA for a residential placement depends on "whether [the child's] placement may be considered necessary for educational purposes or whether the placement is a response to medical, social, or emotional problems that is necessary quite apart from the learning process." Thus, the analysis for determining whether an RTC is appropriate ultimately centers on whether the placement is ***necessary*** for ***educational purposes***. *Id.*

The ALJ concluded that "the evidence shows that Student was making progress on some of his goals as of the June 9, 2017 IEP team meeting. He had increased his participation in counseling therapy and in other related services. He increased his participation in classes and progressed academically." (A.R. at 2930.) Furthermore, the ALJ found that "it was Student's behavior at home that prompted Parents' request for a residential placement" instead of problems at school. (*Id.*) G.R. protests the ALJ erred because (1) G.R.'s expert recommended that he should be placed in an RTC, (2) G.R. regressed at NCA, and (3) G.R.'s behavior at home demonstrated that RTC placement was

necessary. The Court will turn to each of G.R.'s contentions in turn.

### 1. Dr. R.H.'s Recommendation for an RTC

G.R. argues that the ALJ's conclusion is erroneous because Dr. Rienzi Haytasingh ("Dr. R.H."), a child neuropsychologist called by G.R. to testify at the Due Process Hearing, recommended placement in an RTC. (Doc. No. 29-1 at 15.) The District asserts that Dr. R.H.'s testimony and recommendation for an RTC did not support a finding that such a placement was necessary for educational purposes. (Doc. No. 40-1 at 15.)[1] At issue is the discrepancy between Dr. R.H.'s assessment that NCA provided adequate education services, and Dr. R.H.'s recommendation that G.R. be placed in an RTC because NCA was inadequate.

Dr. R.H. and his staff had assessed G.R. over three days in May 2017. (A.R. 2894.) The assessment consisted of (1) a review of G.R.'s records; (2) observations of G.R. at NCA by a graduate student working with Dr. R.H. and by Dr. R.H. during testing of G.R.; (3) interviews with Mother, G.R., and Haley Kitchens, G.R.'s teacher at NCA; and (4) the administration of three standardized tests. (A.R. at 2894.) Based on these observations, Dr. R.H.'s report concluded that instruction at NCA was "mostly appropriate" for G.R. but yet Dr. R.H. recommended placement at an RTC. (A.R. at 2894.) As such, the pertinent question the Court must return to is whether there was evidence that RTC placement was "*necessary* to provide the student with special education and related services." *See* 34 C.F.R. 300.104.

Here, the ALJ noted "Dr. Haytasingh's report did not explain why he believed

---

[1] A point of contention between the parties seems to be whether the Parents obtained Dr. R.H. solely for the purpose of procuring a recommendation for an RTC. Dr. R.H. testified that when he first met with the Parents, the Parents expressed they wanted an assessment for cognitive skills and academic achievement. (A.R. at 3741–42.) According to Dr. R.H., the Parents did not request an assessment for the purposes of being placed in an RTC. (A.R. at 3742.) But Dr. R.H. also testified that he did not include an RTC recommendation in his initial draft report to the Parents, and only included such a recommendation after speaking with Parents. (A.R. at 3784–85, 3819–20.) However, at this time, the Court will not pass judgment on the motivation behind the report, as the relevant question is whether the RTC placement was necessary in the first instance.

Student required the residential placement in light of his findings and conclusions that the North County Academy teacher and aides were successfully getting Student to participate in class, were appropriately responding to his behaviors, and provided appropriate instruction and programming." (A.R. at 2896.) Upon the Court's review of Dr. R.H.'s report, there is some support regarding G.R.'s position. For example, in Dr. R.H.'s report regarding the observation at NCA, Dr. R.H. noted that affirmations such as "[d]on't give up," did not appear effective during the observation, (A.R. at 1951), G.R. inconsistently understood instructional goals, (A.R. 1952), and G.R. did not appear at ease in the environment, (A.R. at 1952.) But nevertheless, because there are just as many, if not more, indicators showing that G.R. was progressing in many respects at NCA, the Court cannot say that the ALJ erred in her conclusion that RTC placement was not necessary based on Dr. R.H.'s report. (*See* A.R. 1119, 1213, 3431–32 (G.R. increased his willingness to participate in therapy sessions; A.R. 2002, 3429–39, 3491–92 (G.R. increased participation in class and progressed academically and in the area of social skills. He had consistent attendance, rode the bus to and from school without adult support, and arrived to school with appropriate hygiene.); A.R. 2027–28, 3063–65, 3501–02, 3509–15, 3661–62 (G.R.'s productivity, safety, and respect scores were still within the expected range for students at NCA and the decrease in percentage points was insignificant). Therefore, the ALJ did not err in discounting Dr. R.H.'s expert opinion.

### 2. G.R.'s Regression at NCA

The Court next turns to whether G.R.'s regression at NRA indicated that placement at an RTC was necessary. G.R. argues the ALJ's conclusion that RTC placement was not necessary as of June 9, 2017 was erroneous because the evidence demonstrates that G.R.'s behavior regressed while at NCA. (Doc. No. 29-1 at 16–17.) In opposition, the District argues G.R. continued to make progress while at NCA, and "the fact that G.R. regressed significantly once placed in a more restrictive setting, where he was subjected to frequent and lengthy holds demonstrates just how appropriate NCA was in addressing his unique needs." (Doc. No. 40-1 at 19.)

11

G.R. argues that prior to February 16, 2017, G.R. only had one behavioral incident, and this increased to 45 behavioral holds between February 16, 2017 to June 12, 2017. (A.R. at 257.) The ALJ noted that there is "no dispute that Student's behavior regressed between February 16, 2017, and June 9, 2017." (A.R. at 2898.) However, Heather Chamberlain, the assistant principal of NCA, was asked "[w]hy doesn't [the increased holds] indicate to you a need for a more restrictive placement?" to which Ms. Chamberlain answered, "we're always trying to keep students [] in the least restrictive setting. And the holds, although they were occurring more frequently, the team there was able to deescalate him and was able to bring him back to task." (A.R. at 4655.) Additionally, when Ms. Kitchens, G.R.'s teacher at NCA was asked "[d]o you believe that for the spring of 2017, G.R.'s behavior at NCA got better or worse?", Ms. Kitchens responded "the intensity and the [Behavioral Emergency Reports] were fewer and farther between and you know, in some sense, showing that some of the interventions we were trying were working." (A.R. at 3413.) As such, the ALJ had an appropriate basis to conclude that by the time of the June 9, 2017 IEP meeting, there was sufficient progress shown such that placement in a more restrictive setting was not necessary for educational purposes. G.R.'s behavior was trending towards improvement, and keeping G.R. at NCA would best provide G.R. a FAPE in the "least restrictive environment" as required by federal and California law. *See* 20 U.S.C. § 1412(a); 34 C.F.R. § 300.114; Cal. Educ. Code § 56031, 56033.5.

Furthermore, the ALJ reasoned "Student's reliance on his minor regression in productivity, safety, and respect to justify the need for a residential placement is misplaced. Student's scores in all areas decreased less than seven percent from the end of the fall 2016 semester to the date of the June 9, 2017 IEP team meeting." (A.R. at 2930.) Accordingly, the ALJ concluded that the "minimal regression does not support a contention that Student was regressing to a point that he was unable to access his education or benefit from it." (A.R. at 2930.) The Court agrees that the minimal regression in G.R.'s behavior does not show that RTC placement was necessary for educational purposes. For example, Ms. Kitchens explained that the minimal regression could be explained by the fact that "as the

year progresses, the difficulty of tasks [] we're working on in class [] increases." (A.R. at 3372.) Accordingly, the ALJ did not err in her conclusion that based on G.R.'s behavior at NCA, placement in an RTC was unnecessary and a more restrictive environment inappropriate for G.R. at the time of the June 9, 2017 IEP meeting.

### 3. G.R.'s Behavior at Home

G.R. also argues that his behavior at home worsened significantly in the spring of 2017, further demonstrating that placement at an RTC was necessary. (Doc. No. 29-1 at 17.) The ALJ rejected this argument, and found that Parents did not inform the District about G.R.'s behavioral issues at home at the IEP meeting on June 9, 2017. (A.R. at 2931.) Furthermore, the District argues that the ALJ correctly determined that Parents placed G.R. in an RTC for reasons that were unrelated to G.R.'s education and instead related to personal events occurring at home.[2] (A.R. at 2931.) However, G.R. contends that this conclusion was erroneous because the recording of the June 9, 2017 meeting demonstrates that Parents did put the District on notice of G.R.'s deterioration at home. (S-125 at A.R. 1119.)

The record reflects that Parents apparently did not share with the District the complete details of the behavior issues at home, and the testimony of the Parents even shows they did not believe "home life came up" at the June 9, 2017 IEP meeting. (A.R. 3200.) Even if the District was provided with some minimal notice of G.R.'s deterioration at home, G.R. has not proven that placement was "necessary for educational purposes" and not merely "necessary quite apart from the learning process," *Clovis*, 903 F.2d at 643; *see also San Rafael Elementary Sch. Dist. v. California Special Educ. Hearing Office*, 482 F.

---

[2] The District lists the following as evidence that Parents placed G.R. in an RTC for reasons unrelated to his education: (1) Parents were going through a divorce in spring of 2017 and would be living in separate houses; (2) G.R. had eloped from Parents at the county fair and at home; (3) they had struggles getting G.R. to shower; (4) they had struggles with G.R. refusing to get off an iPad; (5) G.R. would hit his nanny and father; (6) G.R. smashed a Lego design at home; (7) G.R. screamed at home; and (8) G.R. acted aggressively towards his sister, including chasing her one mile down a beach. (Doc. No. 40-1 at 18; A.R. 952–53, 3028.)

Supp. 2d 1152, 1161 (N.D. Cal. 2007) (holding that Ninth Circuit case law "does not require a school district to address all of the emotional or behavioral problems a student may have, regardless of where and when those problems manifest."). Therefore, the record demonstrates that the District did not have details related to how G.R.'s behavior at home affected his ability to access education. Accordingly, the ALJ did not err in her conclusion.

### C.  May 15, 2018 IEP

The Court will now turn to whether the May 15, 2018 IEP denied G.R. a FAPE by failing to offer: (1) placement in an RTC; (2) cognitive therapy, experiential therapy, and social skills groups as recommended by Dr. R.H.; and (3) "wrap services" to transition G.R. from an RTC to NCA. (Doc. No. 29-1 at 19.)

#### 1.  Placement in RTC in May 15, 2018

G.R. avers the District was required to place him in an RTC as of the May 15, 2018 IEP meeting, because at that time, he was enrolled at Sandhill RTC, and experts maintained that G.R. was not ready to be stepped down to a non-RTC facility. (Doc. No. 29-1 at 20.) Unconvinced, the ALJ found that "the overwhelming evidence demonstrated that Student regressed academically and behaviorally at Cherry Gulch and Sandhill, and that he failed to access any academics at SUWS." (A.R. at 2932, 3774–75, 3831–34.) The ALJ noted that G.R.'s expert, Dr. R.H. even acknowledged that G.R., after 11 months in various RTC placements, was exhibiting behaviors not present at NCA including biting, headbutting, and kicking people in the stomach. (A.R. 886–87, 1030, 2517, 3831–34.)

The Court finds no error in the ALJ's conclusion. The record reflects that G.R. progressed academically and behaviorally at NCA. (A.R. at 2886, 3370.) The same cannot be said of G.R.'s progress at Sandhill. At Sandhill, the record shows that G.R. needed behavioral and academic support 90 percent of the time. (A.R. at 3317.) Additionally, he failed to make any progress at all in a number of areas and he made only 50 percent progress in others. (A.R. at 2826; 4414.) Even more, between the time G.R. arrived to Sandhill through May 9, 2018, Sandhill used a physical restraint to restrict G.R.'s movement over 40 times. (A.R. at 2795). As such, G.R.'s regression in academics belies his assertion that

14

an RTC was necessary for education purposes. *See S.H. v. Mt. Diablo Unified Sch. Dist.*, 263 F. Supp. 3d 746, 770–71 (N.D. Cal. 2017) (concluding that a private program is not appropriate to warrant reimbursement when the student did not prove he made progress in the private program).

### 2. Cognitive Therapy, Experiential Therapy, and Social Skills Groups

G.R. further argues that the May 15, 2018 IEP failed to provide G.R. a FAPE because it did not enhance the IEP with cognitive behavioral therapy, experiential therapy, and social skills groups. (Doc. No. 29-1 at 22.) The District contends "G.R. wholly failed to argue that the May 2018 IEP should have included cognitive behavioral therapy, experiential therapy, or social skills groups in the OAH proceedings. Consequently, because G.R. failed to raise this argument in the OAH proceedings, it is waived." (Doc. No. 40-1 at 20.) In response, G.R. explains he did protest the failure to provide appropriate placement, services, supports, and accommodations to meet his therapeutic and behavioral needs in both the June 9, 2017 and May 8, 2018 IEPs. (Doc. No. 41 at 3–4.) To G.R.'s point, the Court agrees and holds that G.R. has not waived this argument. The record supports G.R.'s contention that he presented the issue of inadequate placement, services, supports, and accommodations for both the June 9, 2017 and May 15, 2018 IEPs at his Due Process Hearing. (A.R. 73, 172, 210, 272, 278–80.)

But contrary to G.R.'s contentions, the record shows that the May 15, 2018 IEP did in fact provide additional and different services from the June 9, 2017 IEP. For example, the May 15, 2018 IEP increased G.R.'s individual counseling from 50 minutes per week to 60 minutes per week and increased his group speech and language from 1,800 minutes per year to 2,700 minutes per year. (*See e.g.*, A.R. 1713–14, 1717–16, 1765, 1782–84.) Thus, the Court cannot say that the May 15, 2018 IEP was devoid of any additional services, supports, or accommodations.

### 3. Wrap Services

Next, G.R. argues that if the Court finds RTC placement was unnecessary, the Court should nonetheless hold the District's failure to provide "wrap services" to help G.R.

transition from Sandhill RTC constituted a denial of a FAPE. (Doc. No. 29-1 at 23.) In particular, G.R. takes issue with the lack of in-house supports provided to him in the May 15, 2018 IEP in order to transition him from Sandhill to NCA and life at home. (*Id.*) The District disagrees, and states the District did in fact provide "wraps services" in the form of parent counseling, which Parents chose not to access, in addition to other transitional services. (Doc. No. 40-1 at 24; A.R. at 4593.)

The evidence shows that while the District did not provide in-home support, the District developed a comprehensive transition plan to support G.R.'s transition from an RTC. The transition plan included, among other things, parent counseling, a transition aide to support G.R. for 60 days, a communication system between home and school, a functional behavior assessment upon G.R.'s acclimation to the new program, and a 45-day IEP meeting to review G.R.'s IEP. (A.R. 1717, 1725.) Accordingly, the record reflects that G.R. was not denied a FAPE as the District did include "wrap services" to help transition G.R. from Sandhill RTC to NCA. Additionally, experts testified that they did not believe in-home visits were required before G.R. was transitioned from Sandhill because the experts "looked at G.R.'s relationship with his family, his parents, and his loving connections with them" and believed "G.R. probably would feel safe and enjoy that, to be in that loving environment." (A.R. at 4927.) Based on the record, the ALJ did not err in concluding that adequate wrap services were offered to G.R.

**D.    Reimbursement**

The IDEA authorizes courts to grant "such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C)(3). The Supreme Court has held that this provision gives courts "broad discretion" to determine the appropriate remedy where a FAPE has not been provided. *Sch. Comm. of Town of Burlington, Mass. v. Dep't of Educ. of Mass.*, 471 U.S. 359, 369 (1985). "[E]quitable considerations are relevant in fashioning relief." *Id.* at 374. Where parents have unilaterally placed a child with a disability in a private school, reimbursement for the cost of enrollment may be awarded "if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to

that enrollment and that the private placement is appropriate." 34 C.F.R. § 300.148; *see also C.B. ex rel. Baquerizo v. Garden Grove Unified Sch. Dist.*, 635 F.3d 1155, 1159 (9th Cir. 2011) ("A parent or guardian is 'entitled to reimbursement only if a federal court concludes both (1) that the public placement violated the IDEA, and (2) that the private school placement was proper under the [IDEA].'") (quoting *Cty. of San Diego*, 93 F.3d at 1466). In *C.B.*, the court explained that "[i]f either criterion is not met, the parent or guardian may not obtain reimbursement" whereas "[i]f both criteria are satisfied, the district court then must exercise its 'broad discretion' and weigh 'equitable considerations' to determine whether, and how much, reimbursement is appropriate." *Id.* (citing *Florence Cty. Sch. Dist. Four v. Carter By & Through Carter*, 510 U.S. 7, 15–16 (1993)).

Based on the foregoing, G.R. was not denied a FAPE in the June 2017 and May 2018 IEPs and thus not entitled to reimbursement. But, even if the Court were to hold that G.R. was denied a FAPE for both the June 2017 and May 2018 IEPs, the Court would not be able to fashion the remedy G.R. requests. G.R. asks that the Court order the District to reimburse Parents for the amount Parents spent to privately place G.R. at Cherry Gulch, SUWS of the Carolinas, and Sandhill. The evidence shows that Cherry Gulch, SUWS of the Carolinas, and Sandhill were not appropriate as private school placements under the IDEA. First, reimbursement is not warranted for the placement of G.R. at Cherry Gulch because G.R.'s aggression "continued unabated, and he made no process academically, socially, or behaviorally." (A.R. at 2901, 3263.) Additionally, Cherry Gulch was not certified by California at the time G.R. attended, and thus, not a facility eligible for reimbursement by the District. (A.R. at 2941, 3709, 3877.) Second, reimbursement would be inappropriate for SUWS at the Carolinas because the wilderness camping program did not have a certified special education teacher, and did not even have an education component in its curriculum. (A.R. at 2941, 3018–19.) And lastly, Sandhill was not an appropriate private placement because, as explained above, G.R. significantly regressed in behavior and academics while at Sandhill. (A.R. 2941, 4709–10, 4745–46.) Even more, because Sandhill was not certified by the State of California, the District could not even

legally fund his placement there. (A.R. 2939.)[3]

* * *

In conclusion, the ALJ's decision was careful and thorough, well-reasoned, and supported by the record. Therefore, based on the record, the parties' briefing, and giving appropriate deference to the ALJ's conclusions, the Court **DENIES** G.R.'s motion for summary judgment, and **GRANTS** the District's motion for summary judgment.

## V.   MOTION TO SUPPLEMENT THE RECORD

G.R. seeks to supplement the administrative record with invoices, receipts, and proof of payment for the costs related to G.R.'s private placement since the close of the due process hearing. (Doc. No. 18-1 at 2.) The District opposes G.R.'s motion. (Doc. No. 25.)

In evaluating a complaint under the IDEA, the district court "shall receive the record of the [state] administrative proceedings, shall hear additional evidence at the request of a party, and, basing its decision on the preponderance of the evidence, shall grant such relief as the court determines is appropriate." 20 U.S.C. § 1415(i)(2)(C). Grounds for introducing additional evidence could include "gaps in the administrative transcript owing to mechanical failure, unavailability of a witness, an improper exclusion of evidence by the administrative agency, and evidence concerning relevant events occurring subsequent to the administrative hearing." *San Diego v. California Special Educ. Hearing Office*, 93 F.3d 1458, 1466 (9th Cir. 1996).

Here, the additional evidence G.R. wishes to include in the record relate only to the costs the Parents expended to place G.R. in RTCs. The additional documents do not bear on any other issues which might assist in supporting G.R.'s case. As such, the Court

---

[3] The ALJ also found that G.R. was not entitled to reimbursement based on equitable considerations. The ALJ concluded that "Parents concealed material facts from Del Mar during the entire time covered by this case, including the affect his behavior had on Parents and, in particular, his little sister. Parents stymied Del Mar's appropriate attempts to assess Student by significantly delaying consent to Del Mar's assessment. And, they stymied Student's IEP process by actively and deliberately concealing that Student had been discharged from Cherry Gulch and that he was attending a wilderness program at SUWS." (A.R. at 2941–42.)

**DENIES AS MOOT** G.R.'s motion to supplement the administrative record.

## VI. CONCLUSION

Based on the foregoing, the Court **DENIES** G.R.'s motion for summary judgment, **GRANTS** the District's motion for summary judgment, and **DENIES AS MOOT** G.R.'s motion to supplement the record. The Clerk of Court is **DIRECTED** to **CLOSE** this case.

**IT IS SO ORDERED.**

Dated: April 21, 2020

Hon. Anthony J. Battaglia
United States District Judge